88 F.3d 63
 Lawrence KULAK, Plaintiff-Appellant,
v.
The CITY OF NEW YORK, the New York City Health and Hospitals
Corporation, Edward Berkelhammer, M.D., personally, Kang Yu,
M.D., personally, Claude Castille, M.D., personally, Shirley
Cairme-Garcia, M.D., personally, Milagros Feliciano, M.D.,
personally, Patricia Roach, personally, Soledad Basa, M.D.,
personally, and Patricia Lambert, in her official capacity
as Executive Director of Kingsboro Psychiatric Center,
Defendants-Appellees.
 No. 1433, Docket 95-9021.
 United States Court of Appeals,
Second Circuit.
 Argued May 1, 1996.
Decided June 21, 1996.
 
 William M. Brooks, Mental Disability Law Clinic, Touro College, Jacob D. Fuchsberg Law Center, Huntington, N.Y. for Plaintiff-Appellant.
 Ellen Ravitch, New York City (Paul A. Crotty, Corporation Counsel of the City of New York, Stephen J. McGrath, Jay Douglas Dean, of counsel), for Municipal Defendants-Appellees.
 David Monachino, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General, of counsel), for State Defendants-Appellees.
 Before NEWMAN, Chief Judge, FEINBERG and OAKES, Circuit Judges.
 OAKES, Senior Circuit Judge:
 
 
 1
 Lawrence Kulak ("Kulak") appeals from a summary judgment entered by the United States District Court for the Eastern District of New York, David G. Trager, Judge, on September 14, 1995, in favor of Appellees the City of New York, the New York City Health and Hospitals Corporation, Edward Berkelhammer, M.D., Kang Yu, M.D., Claude Castille, M.D., Shirley Cairme-Garcia, M.D., Milagros Feliciano, M.D., Patricia Roach, Soledad Basa, M.D., and Patricia Lambert.[1] Kulak sought injunctive and monetary relief in thirteen federal claims and seventeen pendent state law claims for injuries arising out of his involuntary confinement for mental illness at facilities of the City of New York and the State of New York. In this appeal, Kulak asserts that the district court erred in granting summary judgment in favor of the Appellees because genuine issues of material fact exist regarding whether Kulak's rights were violated by the confinement, the administration of medication, and the clinical practices of the Appellee physicians. For the reasons stated below, we affirm.
 
 BACKGROUND
 
 2
 This action is brought under 42 U.S.C. § 1983 (1994) and pendent state law. Kulak contends that his involuntary confinement, the failure to place him in a less restrictive setting, the forced administration of drugs, and several other actions on the part of the Appellee physicians violated his rights to due process and to liberty. In reviewing the facts underlying this summary judgment motion, we construe the evidence in the light most favorable to Kulak, the non-moving party. Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir.1995).
 
 Kulak's Confinement
 
 3
 On January 24, 1991, Kulak's father filed a petition under New York Mental Hygiene Law § 9.43 (McKinney 1996) in the Kings County Supreme Court to have his son evaluated for emergency admission to treat a mental illness. Kulak, a lawyer in his thirties, lived in his parents' home at this time. In the petition, Kulak's father swore to the following statement:
 
 
 4
 Lawrence R. Kulak has not been hospitalized for mental problems before. He refuses to visit the outpatient clinic.... Lawrence R. becomes violent, and breaks things. Lawrence R. has threatened to kill himself. Lawrence R. has made threats to me. Lawrence R. threatened Mother and Sister. Lawrence R. is verbally abusive. He does strange things. Lawrence R. has bizarre ideas .... [and] acts irrationally and is incoherent at times.
 
 
 5
 I AM VERY CONCERNED ABOUT MY SON, LAWRENCE. LAST NIGHT HE SPOKE TO MY WIFE ON THE PHONE AND SAID HE WILL KILL HER, ME, HIS SISTER AND HIMSELF. HE SAID HE WAS BURNING PHOTOGRAPHS OF US IN MEMORY OF HIS DECEASED DOG. THIS MAY BE A PRELUDE TO HIS ELIMINATION OF US. HE HAS INTERMITTENTLY SEEN PSYCHIATRISTS OVER THE YEARS FOR HIS MENTAL PROBLEMS. HE IS VERY CONTROLLING AND REFUSES TO LEAVE OUR HOME, ALTHOUGH WE HAVE OFFERED TO OBTAIN AN APARTMENT FOR HIM. HE HAS LITTERED AND DIRTIED THE ENTIRE HOUSE. I AM NOW LIVING WITH MY DAUGHTER AND HER FAMILY FOR THE PAST MONTH AND I HAVE BEEN UNABLE TO PURSUE MY PROFESSION, ALL DUE TO MY FEAR OF WHAT HE WILL DO NEXT. PLEASE HELP HIM TO GET THE HELP HE NEEDS SO VERY BADLY.
 
 
 6
 Based upon this statement, the court granted the petition and issued a warrant for Kulak's arrest. On January 28, 1991, police arrested Kulak and brought him to the Supreme Court in accordance with the warrant. After a hearing, the court ordered that Kulak be transported to the psychiatric emergency room at Kings County Hospital Center ("Kings County") for an emergency admission evaluation.
 
 Treatment at Kings County
 
 7
 At Kings County, Dr. Edward Berkelhammer conducted an interview of Kulak lasting approximately five minutes. Dr. Berkelhammer's notes of Kulak's exam indicate
 
 
 8
 verbalizations show paranoia and projection[2].... Speech very fast, pressured, well articulated. Mood--anxious, irritable mood, Affect--mildly hypo-manic.... Massive denial. Patient has hands on my arms in a very threatening way. Alert and oriented as to time, place and person.
 
 
 9
 Despite Dr. Berkelhammer's notes, Kulak states that he never grabbed Dr. Berkelhammer and, though agitated because of his detention, remained calm throughout the interview.
 
 
 10
 Based upon the interview, a review of the petition sworn to by Kulak's father, and a review of documents relating to an eviction proceeding against Kulak,[3] Dr. Berkelhammer diagnosed Kulak as suffering from bipolar disorder with paranoid features and concluded that Kulak should be admitted to Kingsboro Psychiatric Center ("Kingsboro") on an emergency basis pursuant to New York Mental Hygiene Law § 9.39. Dr. Rosenberg, another staff psychiatrist not named as a defendant in this case, concurred in the diagnosis and decision to hospitalize after conducting an examination of Kulak and interviewing his parents.
 
 
 11
 Dr. Berkelhammer prescribed a low-level injection of Haldol and Ativan to counteract Kulak's "escalating irritability." The staff administered the medication over Kulak's objection.
 
 
 12
 Transfer to Kingsboro and Initial Examination
 
 
 13
 On the evening of January 28, 1991, Kings County transferred Kulak to Kingsboro, where Dr. Kang Yu authorized Kulak's further confinement without conducting a personal interview. The following day, Dr. Shirley Cairme-Garcia examined Kulak for ten to fifteen minutes. She told Kulak that she prescribed 25 milligrams of Thorazine, an antipsychotic drug, but did not tell him of its potential side effects. Hospital records indicate that although Kulak often refused to take the medication, he consented on three occasions between February 1 and February 6.
 
 The Habeas Corpus Petition
 
 14
 On January 29, 1991, the day after arriving at Kingsboro, Kulak filed a habeas corpus petition in New York Supreme Court seeking release from Kingsboro because he was "not mentally ill or not in need of further retention for inpatient care and treatment." The court appointed an independent psychiatrist, Dr. Richard Weidenbacher, to examine Kulak and held a hearing over several days. During the hearing, three acquaintances of Kulak testified, as did Kulak himself, Dr. Weidenbacher, and Kulak's treating psychiatrist at Kingsboro, Dr. Claude Castille.
 
 
 15
 Dr. Weidenbacher was asked by Kulak's attorney whether Kulak was a danger to himself or others. He responded, "[n]ot in the hospital.... It's my clear impression that it would be dangerous were he to resume residence with [his parents]." He later testified that Kulak "is potentially a danger to himself, ... in addition to potentially a danger to his parents when in proximity to them." Regarding Kulak's continued hospitalization, Dr. Weidenbacher testified:
 
 
 16
 I cannot recommend his discharge from [the] hospital until firm formal arrangements have been made to supervised residential [care], as well as formal arrangements for psychiatric treatment on an out-patient basis.
 
 
 17
 ....
 
 
 18
 I do not think continued residence and treatment in hospital is optimal. But I see it as rational and essential prior to alternative placement....
 
 
 19
 Dr. Castille agreed that Kulak could be moved to a supervised setting outside of the hospital, but stated that
 
 
 20
 if we release[ ] him without such a setting, what will happen is ... as he said in his own word[s][,] he will get panic[ked], frustrated and maybe decompensating and maybe he will be dangerous to his father.
 
 
 21
 ....
 
 
 22
 Mr. Kulak right now is in a supervised setting, the hospital. He is not dangerous but if the patient doesn't receive the treatment necessary he will continue doing--the projection then will not be only with words but he can act.
 
 
 23
 On February 11, 1991, the court, taking into account all of the testimony and noting that Kulak had rejected the recommendation of both doctors regarding supervised treatment, denied the petition. The court stated:
 
 
 24
 The Court dismisses the writ but on the other hand directs the hospital to arrange for a suitable facility as a less restrictive alternative rather than remaining in the hospital for any period of time. The Court recommends to the hospital personnel that the first direction that the social worker and others ... can look to might be some kind of a home setting with supervision and the potential for psychiatric treatment.... I don't want this to go on for too long a period of time. I think that we have to utilize our best efforts to provide a facility as quickly as possible.
 
 
 25
 Following the hearing, Kulak returned to Kingsboro.
 
 
 26
 Treatment at Kingsboro After the Habeas Corpus Hearing
 
 
 27
 Upon his return to Kingsboro, Dr. Castille informed Kulak that Dr. Soledad Basa had directed that Kulak be transferred to ward five, a ward where Kulak had previously resided. Kulak protested against the transfer, asserting that during his previous stay on ward five, other patients had threatened him. Dr. Castille told Kulak that the transfer was necessary because Kulak's treatment team was on ward five. The transfer took place over Kulak's objection. Within several hours of the transfer, another patient punched Kulak on the head. Following this incident, Kingsboro staff placed Kulak under one-to-one observation during the day and segregated him from the other patients during the night.
 
 
 28
 Approximately two days after the habeas corpus hearing, in the presence of a social worker from an open ward who was supposed to interview Kulak for placement, Kulak complained to Dr. Castille that the social worker had not come to meet him on the previous day as he had expected. Based upon her observation of this exchange between Dr. Castille and Kulak, the social worker decided Kulak was not suitable for placement on the open ward. The social worker conducted no personal interview of Kulak.
 
 
 29
 Soon after, a worker responsible for residential housing placement met with Kulak and informed him that placement would take approximately twenty-one days. Kulak protested that such a period of time was unacceptable in light of the court's ruling that he should be placed in a less restrictive setting as soon as possible. A few days later, Dr. Castille informed Kulak that the residential housing worker had determined that Kulak was not suitable for placement in a residential housing facility.
 
 
 30
 On February 13, 1991, two days after Kulak's return to Kingsboro, he spoke to his brother-in-law, a psychiatrist, and asked for help in expediting his discharge. Kulak's brother-in-law suggested that Kulak cooperate with the staff at Kingsboro and take the medication prescribed to him. Kulak agreed to follow his brother-in-law's advice, hoping that Kingsboro would be more willing to discharge a cooperative patient and that the medication would ease his feelings of anxiety. Kulak informed Dr. Cairme-Garcia that he would take Thorazine. Dr. Cairme-Garcia told Kulak that Thorazine was no longer prescribed on his charts. Kulak then arranged for Dr. Cairme-Garcia to speak to his brother-in-law. After this conversation, Dr. Cairme-Garcia agreed to administer Thorazine to Kulak. Kulak was given a 50 milligram liquid dose of Thorazine. Dr. Cairme-Garcia did not inform Kulak of the dosage level, warn him of the potential side effects of Thorazine, or prescribe a companion drug to minimize any side effects.
 
 
 31
 After taking the Thorazine, Kulak states that he experienced slurred speech, dizziness, and blurred vision. Despite complaints to staff, Kulak did not receive any relief from his symptoms. Eventually, Kulak fell asleep and the following day sat insensible in a chair, dazed and disoriented.
 
 
 32
 After this episode, Kulak complained to Dr. Castille that his brother-in-law and Dr. Cairme-Garcia administered medicine that destroyed Kulak's mind. Dr. Castille told Kulak that he would discontinue Thorazine and prescribe Serentil. Dr. Castille described Serentil as an antidepressant, though in actuality the drug is classified as an antipsychotic medication. Dr. Castille did not inform Kulak of the potential side effects of Serentil.
 
 
 33
 After taking Serentil on the night of February 17, 1991, Kulak experienced dehydration and anxiety. He requested medication to ease his symptoms. Kingsboro staff administered Thorazine pursuant to an "as needed" order written by Dr. Cairme-Garcia that had not been discontinued when Dr. Castille cancelled the standing order for Thorazine. After receiving Thorazine, Kulak experienced shallow breathing and a tight chest, diagnosed by a doctor on the ward as anxiety.
 
 
 34
 On March 7, 1991, Kulak was discharged from Kingsboro to a private inpatient facility, Gracie Square Hospital.
 
 Proceedings in the District Court
 
 35
 Kulak filed suit in the Eastern District of New York on January 29, 1992, alleging thirteen federal and seventeen state law violations. The Appellees moved for summary judgment, filing numerous documents and affidavits of the defendant physicians. In opposition to the summary judgment motion, Kulak presented his own affidavits and those of Dr. Peter Stastny.
 
 
 36
 The Stastny affidavits challenge many of the treatment decisions of the Kings County and Kingsboro physicians. For example, regarding Dr. Cairme-Garcia's and Dr. Castille's failure to inform Kulak of Thorazine's side effects, Dr. Stastny states that such treatment "fell below accepted judgment, practice and standards" because "[i]t is a basic element of medical practice for a physician to provide all relevant information ... so that the patient may make an informed decision as to whether ... he wishes to accept the treatment regimen offered." Dr. Stastny provides a similar assessment regarding each of Kulak's treatment claims against Kingsboro. The affidavits of the Appellees refute Stastny's conclusions, arguing that the various treatment decisions were justified exercises of professional judgment.
 
 
 37
 In an unwritten opinion issued from the bench, the district court granted summary judgment to the defendants on all federal claims for relief and dismissed the remaining pendent state law claims, without adjudicating them. In its ruling, the court found that Kulak's challenges to his confinement at Kings County and Kingsboro were barred by issue preclusion because of the state habeas corpus proceeding. The court then held that Kulak's claim regarding his right to placement in a less restrictive environment failed because (1) the state court order did not specifically require Kulak's transfer; (2) the court lacked authority to direct such a transfer; and (3) within three weeks of the habeas hearing, Kingsboro had transferred Kulak to a private in-patient facility. The court next found that Kulak's challenge to the forced administration of Haldol at Kings County failed because there were grounds to believe that Kulak was dangerous at the time. The court also held against Kulak on all claims regarding treatment at Kingsboro, rejecting Dr. Stastny's affidavits and finding that none of the treatment decisions amounted to a substantial departure from accepted practice. Finally, the court found that Kulak had failed to establish a federal claim regarding Kingsboro's decision to transfer Kulak to ward five.
 
 DISCUSSION
 
 38
 Kulak claims that the district court erred in granting summary judgment to the Appellees. He asserts that the claims regarding his involuntary confinement at Kings County and Kingsboro are not barred by issue preclusion and that his protected liberty interest was violated when Kingsboro personnel failed to transfer Kulak into a less restrictive setting. He also claims that the administration of Haldol by Dr. Berkelhammer of Kings County violated his right to refuse medication because he was not creating an emergency at the time the drugs were administered. Kulak further alleges that the district court erred in granting summary judgment because material factual disputes remain regarding whether the treatment he received at Kingsboro substantially departed from accepted practices and standards and thus denied him due process. Kulak finally maintains that the district court erred in holding against him on his claim regarding Kingsboro's decision to transfer him to ward five because disputed facts exist regarding the propriety of the transfer.
 
 
 39
 Summary judgment is mandated when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Though we must accept as true the allegations of the party defending against the summary judgment motion, drawing all reasonable inferences in his favor, Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir.1995), conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment. See Wyler v. United States, 725 F.2d 156, 160 (2d Cir.1983); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In deciding a summary judgment motion, a court must not "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." Rodriguez, 72 F.3d at 1061. We review de novo the district court's grant of summary judgment in favor of the Appellees. Id.; Goetz v. Crosson, 967 F.2d 29, 33 (2d Cir.1992), cert. denied, --- U.S. ----, 116 S.Ct. 80, 133 L.Ed.2d 39 (1995).
 
 
 40
 Mindful of these standards, we will review each of Kulak's claims in turn.
 
 I. The Confinement Claims
 
 41
 Four of the thirteen federal claims for relief in Kulak's complaint relate to his involuntary confinement at Kings County and Kingsboro. In three of these (the first, third, and fourth claims for relief), Kulak asserts that the confinement violated his rights because he was not homicidal, suicidal, a danger to himself or others, or mentally ill to an extent justifying involuntary hospitalization. The district court found these three claims barred by issue preclusion because of the state habeas corpus proceeding. In the fourth confinement claim (the fifth claim for relief), Kulak asserts that Kingsboro violated his rights by failing to place him in a less restrictive setting. The district court found this claim deficient because Kulak did not have a liberty interest in a less restrictive setting and, in any event, Kingsboro transferred him to Gracie Square Hospital approximately three weeks after the conclusion of the habeas corpus hearing. For the reasons given below, we affirm the district court's grant of summary judgment to the Appellees on all four confinement claims.
 
 
 42
 A. Issue Preclusion: Once a matter has been litigated and decided, a party may be foreclosed from litigating the same issue again. This is known as issue preclusion, or, more traditionally, collateral estoppel. See Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984). Issue preclusion is based upon a policy that "it is not fair to permit a party to relitigate an issue that has already been decided against it." Kaufman v. Eli Lilly & Co. 65 N.Y.2d 449, 455, 482 N.E.2d 63, 67, 492 N.Y.S.2d 584, 588 (1985).
 
 
 43
 A federal court examining the preclusive effect of a state court judgment must look to the full faith and credit statute, 28 U.S.C. § 1738 (1994):
 
 
 44
 Such Acts, records and judicial proceedings ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.
 
 
 45
 The Supreme Court has made clear that § 1738 applies in a suit brought under 42 U.S.C. § 1983 in federal court. Allen v. McCurry, 449 U.S. 90, 103-04, 101 S.Ct. 411, 419-20, 66 L.Ed.2d 308 (1980). In such a suit, a state court judgment must be given the same preclusive effect as it would have under the law of the state in which it is rendered. Id.; Migra, 465 U.S. at 81, 104 S.Ct. at 896; see Burgos v. Hopkins, 14 F.3d 787, 792-93 (2d Cir.1994) (state habeas corpus proceeding may have preclusive effect in a later federal § 1983 lawsuit). Thus, in order to determine whether the New York court's denial of Kulak's habeas corpus petition precludes any of the § 1983 claims now before us, we must analyze the habeas corpus proceeding in light of New York issue preclusion law.
 
 
 46
 In New York, issue preclusion applies only to those matters "actually litigated and determined in a prior action." Kaufman, 65 N.Y.2d at 455, 482 N.E.2d at 67, 492 N.Y.S.2d at 588 (quoting Restatement (Second) of Judgments § 27). In the frequently cited case of Schwartz v. Public Adm'r, 24 N.Y.2d 65, 71, 246 N.E.2d 725, 729, 298 N.Y.S.2d 955, 960 (1969), the New York Court of Appeals stated:[T]here are but two necessary requirements for the invocation of the doctrine of collateral estoppel. There must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling.
 
 
 47
 See also Owens v. Treder, 873 F.2d 604, 607 (2d Cir.1989). The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion, here the Appellees. In contrast, the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with Kulak, the party opposing the application of issue preclusion. Schwartz, 24 N.Y.2d at 73, 246 N.E.2d at 730, 298 N.Y.S.2d at 962.
 
 
 48
 Applying the law to this case, we find that Kulak's first, third, and fourth claims for relief are barred. In the habeas corpus proceeding, the court considered whether Kulak's confinement was wrongful because he was not "mentally ill" or "in need of further retention" as required by New York Mental Hygiene Law § 9.39. In denying the writ, the court necessarily found that Kulak met the statutory conditions: he suffered a mental illness to an extent requiring further retention. As made clear in the case law, a person is "in need of further retention" if he poses a substantial risk of harm to himself or others. See Matter of Harry M., 96 A.D.2d 201, 206, 468 N.Y.S.2d 359, 363-64 (2d Dept.1983); Project Release v. Prevost, 722 F.2d 960, 971 (2d Cir.1983). Thus, the matters actually litigated and determined in the state habeas corpus proceeding included (1) whether Kulak suffered a mental illness; and (2) whether, due to the illness, Kulak posed a substantial risk of harm to himself or others so that he was in need of further retention. The testimony of the psychiatrists at the hearing, elicited by both Kulak and the State, confirms that these issues were presented. The court necessarily determined these issues by denying the writ.
 
 
 49
 These matters presented and decided in the state habeas corpus proceeding are identical to the issues in three of the confinement claims now before us. In these claims, Kulak argues that his rights were violated by his confinement because (1) he was not homicidal or suicidal as required by New York Mental Hygiene Law § 9.39; (2) he did not pose a danger to himself or others; and (3) he did not suffer a mental illness justifying involuntary hospitalization. These claims therefore involve the same questions posed in the state court proceeding: Was Kulak mentally ill and a danger to himself or others?
 
 
 50
 Even though there is an identity of issues in this case, issue preclusion would not block Kulak's claims if he could show that he did not have a full and fair opportunity to litigate the issues in the prior proceeding. To determine whether Kulak met this burden, we may look to several factors including:
 
 
 51
 the size of the claim, the forum of the prior litigation, the use of initiative, the extent of the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation.
 
 
 52
 Schwartz, 24 N.Y.2d at 72, 246 N.E.2d at 729, 298 N.Y.S.2d at 961.
 
 
 53
 Kulak claims that because the state court issued a compromise verdict by denying the writ on the one hand but suggesting that Kingsboro place Kulak in a less restrictive setting on the other, he did not have initiative to litigate fully his case. We reject this reasoning because there is no basis for characterizing the court's verdict as a compromise. The hearing transcript is replete with evidence that Kulak opposed the psychiatrists' suggestions regarding placement in a supervised residential care setting and the court specifically noted his opposition in denying the writ.
 
 
 54
 Weighing the other factors listed in Schwartz, we find that Kulak has failed to meet his burden of proving that he lacked a full and fair opportunity to litigate the issues of his mental illness and risk of harm in the lengthy and hard-fought state habeas corpus proceeding. Therefore, we find that issue preclusion bars Kulak from relitigating these claims, and we affirm the district court's grant of summary judgment to the Appellees on Kulak's first, third, and fourth claims for relief.
 
 
 55
 B. The Right to a Less Restrictive Setting: We turn to Kulak's remaining confinement claim and address it briefly. In his fifth claim for relief, Kulak contends that the state court created a protected liberty interest in a less restrictive setting when it denied the habeas corpus petition but "direct[ed] the hospital to arrange for a suitable facility as a less restrictive alternative." Kulak claims that Appellee Patricia Roach, a Kingsboro administrator, violated this protected liberty interest when she failed to transfer Kulak promptly. We disagree with Kulak's contention, and therefore affirm the district court's grant of summary judgment to the Appellees on this claim.
 
 
 56
 We have held that there is no general federal constitutional right to community placement or a least restrictive environment. Society for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239, 1247-49 (2d Cir.1984). However, a state may create such a liberty interest protected under the Fourteenth Amendment by regulations, statutes, or court orders "mandatory in character." Washington v. Harper, 494 U.S. 210, 221, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178 (1990). Kulak asserts that the state court decision in the habeas corpus proceeding created such a right because it was mandatory and required Kingsboro to transfer Kulak to a less restrictive setting.
 
 
 57
 A review of the court's decision, however, makes clear that the language cited by Kulak as creating a mandatory right was at most an indication that, in the court's opinion, Kingsboro was not the optimal setting for Kulak, and that the court might reconsider its decision to deny the writ if Kulak remained at Kingsboro for too long a period of time. The court urged both Kulak and Kingsboro to use "best efforts" in finding a suitable alternative environment for Kulak. The court did not direct that such placement be made in any specific amount of time, nor did it attempt to define a "suitable" facility, though it "recommend[ed]" that the Kingsboro staff consider a "home setting." These statements by the court during the hearing did not appear in the court's final order denying the writ. This is consistent with the view under New York law that the State defendants have discretion regarding patient transfer. See Savastano v. Prevost, 66 N.Y.2d 47, 50, 485 N.E.2d 213, 215, 495 N.Y.S.2d 6, 8 (1985) (per curiam).
 
 
 58
 In advancing his claim, Kulak relies primarily on Walters v. Grossheim, 990 F.2d 381 (8th Cir.1993). In Walters, prison officials of the State of Iowa were under a direct court order to move an inmate from a Level III environment to a less restrictive, lower-security Level IV setting. Once the court order was entered, the officials had no "lawful authority" to retain the inmate in a high security setting. Walters, 990 F.2d at 384-85. By contrast, the court in Kulak's case entered an order denying Kulak's habeas corpus petition, thereby giving Kingsboro lawful authority to confine Kulak. The order did not mandate Kulak's transfer. Thus, Kulak's reliance on Walters is misplaced.
 
 
 59
 Moreover, Kingsboro did not simply ignore the court's suggestion that Kulak be evaluated for placement in an alternative setting. Rather, workers from an open ward and from residential housing observed or met with Kulak and determined him unsuitable for transfer. These actions on the part of Kingsboro evidence a willingness to follow the court's suggestions regarding alternative placement. We find that the state court order denying Kulak's habeas corpus petition did not give Kulak a protected liberty interest in a less restrictive environment. Therefore, we affirm the district court's grant of summary judgment to the Appellees on Kulak's fifth claim for relief.
 
 II. The Treatment Claims
 
 60
 We turn next to Kulak's claims regarding the treatment he received at Kings County and Kingsboro. In his second claim for relief, Kulak asserts that the administration of Haldol at Kings County violated his rights because he did not consent to medication and was not creating an emergency. In his sixth through twelfth claims for relief, Kulak contends that the district court erred in granting summary judgment because Dr. Stastny's expert affidavit establishes that several actions on the part of the Kingsboro physicians fell substantially below minimally acceptable practices. For the reasons discussed below, we find that the district court properly granted summary judgment to the Appellees on all of Kulak's treatment claims.
 
 
 61
 A. The Administration of Haldol at Kings County: "It is a firmly established principle of the common law of New York that every individual 'of adult years and sound mind has a right to determine what shall be done with his own body' and to control the course of his medical treatment." Rivers v. Katz, 67 N.Y.2d 485, 492, 495 N.E.2d 337, 341, 504 N.Y.S.2d 74, 78 (1986) (citations omitted). Such a right may be set aside only in narrow circumstances, including those where the patient "presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution." Rivers, 67 N.Y.2d at 495, 495 N.E.2d at 343, 504 N.Y.S.2d at 80; see Project Release v. Prevost, 722 F.2d 960, 978-80 (2d Cir.1983). In New York, this right to refuse medication derives from a mandatory policy expressed in N.Y. Comp.Codes R. & Regs., tit. 14, § 527.8(c)(1) (1995):
 
 
 62
 (c) Patients who object to any proposed medical treatment or procedure ... may not be treated over their objection except as follows:
 
 
 63
 (1) Emergency treatment. Facilities may give treatment, except electroconvulsive therapy, to any inpatient, regardless of admission status or objection, where the patient is presently dangerous and the proposed treatment is the most appropriate reasonably available means of reducing that dangerousness. Such treatment may continue only as long as necessary to prevent dangerous behavior.
 
 
 64
 A "dangerous" patient is defined as one who "engages in conduct or is imminently likely to engage in conduct posing a risk of physical harm to himself or others." Id. at § 527.8(a)(4).
 
 
 65
 Kulak asserts that the involuntary administration of Haldol did not conform to the mandatory criteria of § 527.8 because he was not creating an emergency justifying involuntary medication. He claims that, at a minimum, issues of fact remain regarding whether Dr. Berkelhammer's decision to medicate was illegal.
 
 
 66
 In applying the § 527.8 criteria, we must accept Kulak's assertion that he acted calmly, though Dr. Berkelhammer claims that Kulak grabbed him in a threatening manner and was "extremely irritable." Nevertheless, we find that Dr. Berkelhammer's decision to administer a low-level dose of Haldol was justified under § 527.8 because Kulak could be considered "imminently likely to engage in conduct posing a risk of physical harm to himself or others." Kulak admits that he was "extremely angry at [his] detention," and, when asked whether he wanted to hurt someone, he answered ambiguously, stating "I'm angry." In addition to these statements, Dr. Berkelhammer reviewed the petition sworn to by Kulak's father, which indicated that Kulak had physically threatened members of his family and had threatened to kill himself. Dr. Berkelhammer's diagnosis of Kulak as suffering from bipolar disorder and anxiety was also confirmed by another staff psychiatrist. These factors taken together led Dr. Berkelhammer to conclude that Kulak should be medicated.
 
 
 67
 Dr. Stastny, Kulak's expert, stated that even if Dr. Berkelhammer's decision to administer drugs to control Kulak's behavior were correct, Dr. Berkelhammer could have administered only Ativan, an antianxiety drug, rather than combining Ativan with Haldol, a drug described by the Physicians Desk Reference as appropriate for treating psychosis, Tourette's Syndrome, and agitation in children and geriatric patients. Dr. Stastny's statement, however, does not create a genuine issue of material fact regarding whether Dr. Berkelhammer's behavior amounted to a failure to properly apply the § 527.8 guidelines; it simply suggests an alternate treatment option.
 
 
 68
 Given the factors examined by Dr. Berkelhammer and the admitted agitation of Kulak, we find that Dr. Berkelhammer's decision to medicate Kulak was a proper exercise of his professional judgment and comported with the requirements of § 527.8(c)(1). We therefore affirm the district court's grant of summary judgment to the Appellees on Kulak's second claim for relief.
 
 
 69
 B. The Treatment at Kingsboro: In his sixth through twelfth claims for relief, Kulak asserts that various treatment decisions by Dr. Cairme-Garcia and Dr. Castille while Kulak was confined at Kingsboro denied Kulak due process in violation of § 1983. Kulak claims that he was not provided dosage and side effect information, was not properly monitored, and was given drugs that were not indicated for his illness. Kulak contends that the district court erred in granting summary judgment to the Appellees on these claims because disputed issues of fact exist regarding whether these treatment decisions were constitutionally deficient. We disagree with Kulak and find that the district court properly granted summary judgment to the Appellees.
 
 
 70
 As the Supreme Court has instructed, a doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are "such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment." Youngberg v. Romeo, 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982); P.C. v. McLaughlin, 913 F.2d 1033, 1042-43 (2d Cir.1990). This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference. See Estate of Porter by Nelson v. Illinois, 36 F.3d 684, 688 (7th Cir.1994); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1143, 1144-47 (3d Cir.1990).
 
 
 71
 In an effort to defeat summary judgment, Kulak submitted two affidavits from his expert, Dr. Stastny. Dr. Stastny claimed that "accepted professional judgment, practice, or standards" encompass at the minimum a duty to medicate the patient with drugs appropriate to the patient's illness and susceptibility to side effects, and refrain from combining antipsychotic drugs such as Thorazine and Serentil in the usual course of a patient's treatment. Dr. Stastny asserted that the treatment decisions of Dr. Castille and Dr. Cairme-Garcia substantially departed from these accepted standards because the doctors medicated Kulak with antipsychotic drugs even though nothing in the hospital records indicated that he was psychotic, and administered the antipsychotic drug Thorazine to relieve side effects Kulak suffered from another antipsychotic drug, Serentil.
 
 
 72
 Dr. Stastny's affidavits, however, fail to raise a material issue regarding the treatment decisions of the Kingsboro physicians. Underlying Dr. Stastny's affidavits is his conclusion, based upon a review of the hospital records and a clinical evaluation of Kulak following his discharge from Kingsboro, that Kulak was not manic or psychotic at the time the contested treatment decisions were made. Working from this conclusion, Dr. Stastny determined that the decision to administer antipsychotic medication to Kulak fell below minimally acceptable practice. However, Dr. Stastny's differing diagnosis of Kulak does not create a fact issue because his affidavit does not assert that it was substantially below accepted professional judgment for the treating physicians to believe that Kulak was manic or psychotic. Dr. Stastny, therefore, simply disagreed with the diagnosis made by Dr. Castille and Dr. Cairme-Garcia.
 
 
 73
 Five doctors examined Kulak during the course of his hospitalization and each determined that Kulak was either manic or psychotic.[4] The Appellees' affidavits allege that Kulak made threatening statements to his family, patients, and staff, and exhibited delusions and paranoid ideation. A number of different people observed this behavior over the course of several days.
 
 
 74
 Dr. Stastny assumed that Kulak did not engage in any of the behavior cited by the Appellees because Kulak flatly denied having done so. In this respect, our case presents quite a different situation than one recently faced by this court in Rodriguez v. City of New York, 72 F.3d 1051 (2d Cir.1995), where the plaintiff brought an action under § 1983 claiming that her involuntary commitment to a mental institution violated the mandatory requirements of New York Mental Hygiene Law § 9.39. In Rodriguez, we decided that an expert affidavit asserting that the treating physicians made incorrect and objectively unreasonable decisions created an issue of fact for trial regarding whether the doctors acted within the realm of professional competence in treating the plaintiff. Id. at 1065.
 
 
 75
 The dispute in Rodriguez, however, concerned events in two short commitment interviews, lasting no more than one half hour combined, that took place after Rodriguez had come to the hospital seeking medication. Moreover, Rodriguez conceded that she had made some of the statements the doctors claimed to rely upon in confining her, but claimed that she also made related statements ignored by the doctors "that would permit competing inferences to be drawn as to the meanings of the undisputed events." Rodriguez, 72 F.3d at 1064. In contrast, Kulak simply denies every allegation made by the Appellees without regard to the fact that he was observed for several days after being admitted pursuant to a petition by his father specifying Kulak's dangerous behavior. Nothing in Rodriguez purports to hold that bare denials of statements allegedly made by patients under such circumstances is enough to defeat summary judgment. Because the Kingsboro physicians medicated Kulak in a manner suitable to their diagnosis, they did not "substantially depart" from accepted practices. Kulak's claims regarding the medication decisions thus cannot be sustained.
 
 
 76
 Regarding Kulak's claim that Dr. Cairme-Garcia violated § 1983 by failing to administer a drug to block the side effects of Thorazine and by failing to monitor Kulak for adverse side effects, we note that Dr. Stastny asserted only that hospital personnel must either prescribe a side effect blocker or monitor the patient for side effects. The hospital staff did monitor Kulak, and thus a § 1983 claim on this basis cannot be sustained.
 
 
 77
 Dr. Stastny also stated that the failure to inform Kulak of dosage and side effects when administering Thorazine fell well below accepted practice because "[i]t is a basic element of medical practice for a physician to provide all relevant information ... so that the patient may make an informed decision as to whether ... he wishes to accept the treatment regime offered." While Dr. Stastny's affidavit does appear to raise a question of fact on the issue of failure to inform, we nevertheless find that qualified immunity shields Dr. Cairme-Garcia and Dr. Castille from suit on this ground.
 
 
 78
 Qualified immunity will shield from suit a government official sued in his or her individual capacity unless the official's conduct violates clearly established law or such conduct was not objectively reasonable "in light of the legal rules that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)); Allen v. Coughlin, 64 F.3d 77, 81 (2d Cir.1995). Here, the district court correctly held that the Kingsboro treating physicians are immune from liability because it would not have been objectively reasonable for them to have known that their conduct violated Kulak's constitutional rights. Though state law exists requiring physicians to inform patients of "reasonably foreseeable risks" associated with the administration of psychotropic medications such as Thorazine, see N.Y. Comp. Codes R. & Regs., tit. 14, § 527.8(b), nothing in the federal case law put the Kingsboro physicians on notice that their actions might subject them to § 1983 liability. No clear line of federal law establishes that it is a "substantial departure" from accepted practice for a physician to fail to inform a patient of the risks of psychotropic medications. See Weiss v. Missouri Dept. of Mental Health, 587 F.Supp. 1157, 1161 (E.D.Mo.1984) (finding no clearly established right to be informed of Thorazine's side effects); see also Washington, 494 U.S. at 231, 110 S.Ct. at 1042 ("Though it cannot be doubted that the decision to medicate has societal and legal implications, the Constitution does not prohibit the State from permitting medical personnel to make the decision under fair procedural mechanisms."). Though Kulak may succeed on a state law cause of action for failure to inform, we find that the physicians are entitled to qualified immunity from this court on Kulak's § 1983 claim.
 
 
 79
 In sum, none of the decisions to medicate Kulak amounted to a substantial departure from accepted psychiatric practice. Though Dr. Castille and Dr. Cairme-Garcia's failure to inform Kulak of side effects and dosage may, according to Dr. Stastny's affidavit, have amounted to a substantial departure from accepted practice, the physicians are nevertheless shielded from suit by the doctrine of qualified immunity. Therefore, we affirm the grant of summary judgment to the Appellees on Kulak's sixth through twelfth claims for relief.
 
 III. The Decision to Move Kulak to Ward Five
 
 80
 In his thirteenth claim for relief, Kulak asserts that Dr. Castille and Dr. Basa of Kingsboro violated his right to safe confinement by moving him from ward six to ward five. Kulak contends that the district court erred in granting summary judgment on this claim because disputed issues remain regarding whether the doctors acted properly in transferring Kulak.
 
 
 81
 An involuntarily confined patient has a right to "conditions of reasonable care and safety." Youngberg, 457 U.S. at 324, 102 S.Ct. at 2462; P.C., 913 F.2d at 1044. The decisions of physicians regarding the care and safety of patients are entitled to a presumption of correctness. Youngberg, 457 U.S. at 324, 102 S.Ct. at 2462. Kulak claims that his right to safety was violated when, despite Kulak's complaints that ward five patients had threatened him, the Appellees transferred him to ward five where he was punched by another patient. Dr. Castille states that the transfer was necessary because Kulak's treatment team worked on ward five. To refute Dr. Castille, Kulak points out that the treatment team also managed a few patients on ward six, including himself for a period of time prior to the transfer.
 
 
 82
 This assertion, however, does not raise a material issue of fact sufficient to defeat summary judgment. The undisputed facts of this case demonstrate that Dr. Castille and Dr. Basa exercised professional judgment in transferring Kulak to ward five. Kulak's treatment team operated primarily on ward five, and Kulak had not been assaulted when he previously resided in this ward. Moreover, the Appellees did not treat Kulak's plight with indifference. As soon as the patient assaulted Kulak, Kingsboro placed Kulak on one-to-one observation during the day and moved him into a segregated room for sleeping, thereby ensuring his safety. Given Youngberg 's admonition that decisions such as the one made by the physicians here are presumed to be correct, we find that Kulak's right to safety was not violated by the ward transfer. We therefore affirm the district court's grant of summary judgment to the Appellees on Kulak's thirteenth claim for relief.[5]
 
 CONCLUSION
 
 83
 For the foregoing reasons, we affirm the summary judgment in favor of the Appellees.
 
 
 
 [1]
 Appellees City of New York and New York City Health and Hospitals Corporation operate Kings County Hospital Center. Dr. Berkelhammer is a psychiatrist employed by Kings County Hospital Center. Dr. Yu, Dr. Castille, Dr. Feliciano, Dr. Caimre-Garcia, and Dr. Basa are physicians employed at Kingsboro Psychiatric Center, a facility operated by the State of New York. Patricia Roach and Patricia Lambert are administrative executives of Kingsboro Psychiatric Center
 
 
 [2]
 "Projection" means that one is unconsciously attributing one's own feelings to others
 
 
 [3]
 A few months before the examination, Kulak was evicted from an apartment leased by his parents. The building owner claimed Kulak had played loud music, exercised in the hallways, been verbally abusive to other tenants, rang the doorbell of another apartment at odd hours of the night and morning, and kicked a dog. Kulak explains that the doorbell ringing occurred in retaliation for excessive noise. The dog's owner swears in an affidavit that Kulak did not kick her dog--it was a case of mistaken identity
 
 
 [4]
 These examinations were: Dr. Berkelhammer on 1/28; Dr. Rosenberg on 1/28; Dr. Caimre-Garcia on 1/29; Dr. Castille on 2/11 and 2/17; and an unidentified state doctor on 2/18
 
 
 [5]
 Because we affirm the grant of summary judgment to the State Defendants on each of Kulak's claims, there is no basis for his claim against Patricia Lambert, whom he sued in her official capacity in order to secure expungement of his hospital records. We therefore affirm the grant of summary judgment on that claim as well