**John BYRNE, Plaintiff,**

v.

**OESTER TRUCKING, INC. and Joseph Calvin Drake Defendant.**

**No. 03 Civ. 2335(CBM).**

United States District Court, S.D. New York.

June 29, 2005.

Joseph Scarglato, Morris, Duffy, alonso & Faley, LLP, Matthew Jude Vitucci, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

MOTLEY, District Judge.

## I. BACKGROUND

### A. Introduction

This action stems from an accident that occurred on the Long Island Expressway in July of 2002. Plaintiff John Byrne alleges that he sustained serious injuries and damage to his property resulting from defendant Oester Trucking, Inc.'s tractor-trailer sideswiping plaintiff's Jeep.

### B. Procedural History

John Byrne ("Byrne") filed this action in the Supreme Court, County of New York, on February 26, 2003. The action was removed to federal court on April 4, 2003 on the basis of diversity jurisdiction.

Defendants Oester Trucking, Inc. ("Oester") and Joseph Calvin Drake ("Drake") answered the complaint on August 29, 2003, and on October 15, 2003, the matter was transferred from Judge Batts to the undersigned.

Presently before the court is the defendants' motion for summary judgment, filed on August 10, 2004.

### C. Facts

In the early afternoon of July 1, 2002, Byrne was operating his recently purchased 2000 Jeep in the far left lane of the three lane Long Island Expressway heading west, at about exit 21, in Queens, New York. (Byrne Dep. at 10, 15; Drake Dep. at 7, 23). The highway in that area is divided by a cement divider that was approximately five feet from the far left lane. (Byrne Dep. at 21; Drake Dep. at 23).

Drake was operating a tractor-trailer owned by his employer Oester, Pennsylvania plate number AE56489, in the center lane of the Long Island Expressway in the same vicinity as Byrne. (Complaint at 1; Drake Dep. at 23). Drake was on his way to make a "pick up," having made a delivery on Long Island earlier in the day. (Drake Dep. at 20). Traffic just prior to the time of the accident had been "stop and go" due to construction, but had begun to "open up," and vehicles were beginning to accelerate. *Id.* at 23–24. At that point in time, according to Drake, there were two stopped vehicles in the center lane in front of Drake's tractor-trailer.[1] *Id.* at 25–

---

1. Byrne testified that there was at least one vehicle in the center lane in front of Drake's tractor-trailer, and that it had been moving just before the accident. (Byrne Dep. at 19–20).

26. The vehicle closest to Drake's tractor-trailer was stopped in the center lane behind another vehicle that was half in the center lane and half in the right lane, also stopped. *Id.* Drake, who had accelerated to approximately 45 mph, upon observing these two stopped vehicles in front of him, forcefully applied his brakes and attempted to steer the tractor-trailer to the left in order to avoid the stopped cars in the roadway. *Id.* at 28–29.

Byrne, who was operating his Jeep at a rate of approximately 55–60 mph in the far left lane, was even with the trailer section of Drake's tractor-trailer just before the accident. (Byrne Dep. at 18–19). Upon seeing Drake's tractor-trailer change lanes from the center lane to Byrne's lane, Byrne applied his brakes to avoid being struck by the tractor-trailer. *Id.* at 23. However, not having at any time observed Byrne's Jeep, the trailer section of Drake's tractor-trailer collided with Byrne's Jeep when Drake entered the left lane, forcing it up and onto the cement divider where it struck a light pole that was situated in the center of the divider. *Id.* at 24. Byrne's Jeep stopped there, with the two driver side wheels of the Jeep on the left side of the divider and the two passenger side wheels on the right side of the divider. *Id.* at 24–26. The Jeep was leaning to the right so that the roofline of the Jeep rested against the trailer portion of Drake's tractor-trailer, midway down the trailer. (Byrne Dep. at 25–26; Drake Dep. at 31). Byrne was wearing a seatbelt, which did not tear as a consequence of the impact, and although the Jeep was equipped with air bags, they did not deploy. (Byrne Dep. at 27–28). Resulting from the impact or impacts, the back of Byrne's neck and head hit the headrest. *Id.*

Byrne was assisted from his vehicle by emergency personnel and transported to Elmhurst Hospital where he presented complaints of pain in his neck and back.[2] (Pl.'s Rule 56.1 Stmt. ¶ 5; Def.'s Rule 56.1 Stmt. ¶ 3). Approximately ten to fourteen days later, Byrne sought treatment from Leonard Harrison, M.D., an orthopedic doctor, complaining of pain in his left hip and lower back, for which Dr. Harrison prescribed physical therapy and painkillers. (Pl.'s Rule 56.1 Stmt. ¶ 14, 17). Byrne saw Dr. Harrison through September 2003. Byrne also attended physical therapy sessions approximately seventy-eight (78) times during the period August 12, 2002 through May 21, 2003, and continued these sessions twice weekly until October 2003. (Pl.'s Rule 56.1 Stmt. ¶ 18, 20; Def.'s Rule 56.1 Stmt. ¶ 6). In addition to the therapy sessions, Byrne followed a home exercise regimen, which he continued to follow through the filing of this action. (Pl.'s Rule 56.1 Stmt. ¶ 21).

Byrne visited neurologist Jerome M. Block, M.D. on August 8, 2002, complaining of low back pain and of a "pins and needles" sensation along the outer aspect of his left thigh when standing. *Id.* ¶ 27. Byrne reported that his pain increased while climbing stairs, rolling over in bed, arising from a seated position, and that certain movements of his left leg would cause sharp pain in the same area. *Id.* Dr. Block reported that Byrne was unable to laterally bend at the waist with the same range of motion as would be expected in a "normal" man of Byrne's age and health, that his ability to tilt to the left was diminished by approximately 25–30%, that attempts to bend to the left triggered a painful reaction in his left buttock area, and that left straight leg raising resulted in pain at 70 out of a possible 90 degrees of elevation. *Id.* ¶ 28.

Byrne underwent magnetic resonance imaging ("MRI") on August 13, 2002, which revealed a moderate central and

---

**2.** There is no indication in the parties' submissions that Drake was injured.

left-sided disc herniation at the L2–3 vertebral level causing constriction of the spinal canal in immediate proximity to nerve structures running from the spinal cord down to the patient's left buttocks and lower extremity. *Id.* ¶ 29. The MRI also showed bulging, which was causing a mild compression of the thecal sac at the L1–2 level, and at least one other left-sided herniation at L4–5 causing similar compression of the thecal sac at that level. *Id.*

Byrne's hip and lower back pain resurfaced in March of 2004, causing him to return to Dr. Harrison's office. (Pl.'s Rule 56.1 Stmt. ¶ 19). The record does not reveal any further treatment by Dr. Harrison.

Byrne claims that an examination by Dr. Block on May 18, 2004 indicated that Byrne's ability to laterally bend at the waist had not meaningfully improved and he again had problems, as before, with straight leg raising in both seated and supine positions. *Id.* ¶ 31. Byrne also asserts that he continues to experience low back pain every couple of weeks, which persists for one or two days at a time. *Id.* ¶ 33.

There are two prior incidents involving Byrne that are relevant to the matter at hand because they bear on the issue of causation. One is an occasion approximately fifteen (15) years prior to the accident in the instant case, after which Byrne experienced pain in the lower right side of his back while playing golf. (Pl.'s Rule 56.1 Stmt. ¶ 22). Byrne was treated by a physician on one occasion for this, had an MRI, and received no further care. *Id.* ¶ 22. The other incident was a 1990 car accident in which Byrne was involved. (Byrne Dep. at 58–61). Following the 1990 accident, Byrne was seen in the emergency room of Roosevelt Hospital for shoulder pain. (Def.'s Rule 56.1 Stmt. ¶ 8; Pl.'s Rule 56.1 Stmt. ¶ 24). Byrne subsequently underwent physical therapy, consisting of stretches to the neck, ice treatment and use of a TENS unit. (Def.'s Rule 56.1 Stmt. ¶ 8).

Byrne alleges that since the accident in the instant case, he can no longer golf, play tennis, jog, or box, and has difficulty picking things up and getting in and out of chairs and bed. (Def.'s Rule 56.1 Stmt. ¶ 10; Pl.'s Rule 56.1 Stmt. ¶ 34). Byrne also claims that as a result of the accident he missed one week of work at his job as a bartender where he works one shift per week. *Id.*

## II. DISCUSSION

### A. Standard on Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith" if it is shown that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 n. 4, 106 S.Ct. 2548, 2552 n. 4, 91 L.Ed.2d 265 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir.1999) (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) (internal quotations and citations omitted) (alteration in original).

## B. New York Insurance Law

■■■ Defendants allege that the injuries claimed by Byrne do not amount to "serious injury" within the meaning of Insurance Law § 5102, commonly known as New York's No–Fault Insurance Law. The purpose of New York's No–Fault Insurance Law is to promote prompt resolution of injury claims, limit cost to consumers and alleviate unnecessary burdens on the courts. *Pommells v. Perez*, 4 N.Y.3d 566, 567, 797 N.Y.S.2d 380, 381, 830 N.E.2d 278, 279 (2005) (citing the Comprehensive Automobile Insurance Reparations Act, L 1973, ch 13; Governor's Mem. Approving L 1973, ch 13, 1973 McKinney's Session Laws of NY, at 2335). Injured parties are compensated under car owners' insurance policies for "basic economic loss" resulting from the use or operation of that vehicle in New York State, without regard to fault. *Id.* at 570, 797 N.Y.S.2d at 382, 830 N.E.2d at 280. In order to recover against the car owner or driver for non-economic loss, the injury must be defined as "serious." N.Y. Ins. Law § 5104 (Consol.2005). "Serious injury" is defined as a personal injury that results in:

death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins Law § 5102 (Consol.2005).

■■■ Defendants initially argue that plaintiff's action should be dismissed because plaintiff, in response to defendants' demand for interrogatories, did not specify under which particular category of § 5102 his injuries fell. However, defendants' interrogatories did not solicit this information. Defendants' interrogatory requested plaintiffs to, "Specify each category of damages alleged herein including any medical diagnosis and prognosis relating to personal injuries, and state whether each such injuries claim to be permanent and whether treatment is continuing." (Pl.'s Rule 56.1 Stmt., Exh. E). Plaintiff's answer comprehensively listed the injuries allegedly sustained and further stated that "[t]he accident and injuries sustained by the plaintiff caused and contributed to … the need for medication and treatment," that "[t]he above injuries and their sequelae are permanent and possessive in nature and character" (Def.'s Rule 56.1 Stmt., Exh. B). Had defendants desired the word "category," as used in defendants' interrogatory, to have signified "category of injury as defined in § 5102 of the New York State Insurance Law," they could have fashioned their interrogatory to

this effect. They did not, and therefore plaintiff's answer is sufficiently responsive. Further, plaintiff's answer was aligned with the purposes of Federal Rule of Civil Procedure 33, because it enabled defendants to prepare for trial, to narrow the issues, and to reduce the possibility of surprise—all goals of Rule 33. 8A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2162 (1994).

Defendants in the instant case bear the burden, on summary judgment, of establishing that plaintiff has not sustained a serious injury as defined in § 5102. *Tarnopolsky v. Sanchez,* 2002 WL 31409927, *2, 2002 U.S. Dist. LEXIS 20588, *6–7 (S.D.N.Y.2002). If defendants meet this burden, the burden then shifts to the plaintiff to prove he has suffered serious injury. *Id.* The issue of whether plaintiff has sustained such an injury under the statute is a threshold issue for the court to decide. *Licari v. Elliott,* 57 N.Y.2d 230, 236, 455 N.Y.S.2d 570, 441 N.E.2d 1088 (1982).

To meet their burden, defendants must show, through submission of competent medical evidence, that the plaintiff did not suffer a serious injury causally related to the accident. *John v. Engel,* 2 A.D.3d 1027, 1028, 768 N.Y.S.2d 527 (3d Dep't 2003). Here, defendants have met their burden by submitting, in support of their motion, the reports of Orthopedist Irving Liebman, M.D., Neurologist Paul Slotwiner, M.D., and Radiologist Elizabeth Lazzara, M.D. Dr. Liebman's report was based on an examination of Byrne he conducted on April 20, 2004. Dr. Liebman found no orthopedic objective evidence of disability, and opined that

Byrne suffered merely soft tissue injuries from the July 1, 2002 accident, from which he has fully recovered. (Def.'s Summ. J. Mot., Exhibit G). Dr. Slotwiner's independent neurologic evaluation concluded that there were "no objective neurologic findings indicating neurologic sequelae of the reported incident of July 1, 2002." (Def.'s Summ. J. Mot., Ex. H). Dr. Lazzara's report consisted of a review of the original radiology report of August 13, 2002, which indicated left paracentral disc herniations at L2–3 and L5–S1, L1–2, L3–4 and L4–5 disc bulges, multilevel degenerative disc disease with spondylosis, and facet osteoarthritis. (Def.'s Summ. J. Mot., Ex. I). Dr. Lazzara commented that "[d]egenerative disc disease, spondylosis and osteoarthritis are chronic processes of longstanding duration that are not acute sequelae of trauma," and that "disc degeneration/desiccation is a normal part of aging...." (*Id.*). Dr. Lazzara further remarked that the disc bulges and the L5–S1 herniation are unlikely due to the accident in question, and "the L2–3 disc herniation is indeterminate from the present examination." *Id.*

The burden now shifts to plaintiffs to raise a triable issue of fact that a serious injury was sustained. *Bent v. Jackson,* 15 A.D.3d 46, 788 N.Y.S.2d 56, at 57 –58 (1st Dep't 2005) (citing *Gaddy v. Eyler,* 79 N.Y.2d 955, 582 N.Y.S.2d 990, 591 N.E.2d 1176 (1992)).

Plaintiff here alleges that his serious injuries fall under two categories within Insurance Law § 5102(d): (1) permanent consequential limitation of use of a body organ or member; (2) significant limitation of use of a body function or system.[3] Because the intent of the No–Fault

---

**3.** Plaintiffs do not allege injury under the ninth category, "a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment." N.Y. INS LAW § 5102

Law is to weed out frivolous claims and limit recovery to significant injuries, courts require objective proof of plaintiff's injury; subjective complaints alone are not sufficient. *Toure v. Avis Rent A Car Sys.*, 98 N.Y.2d 345, 350, 746 N.Y.S.2d 865, 774 N.E.2d 1197 (2002).

 With respect to each of the two categories presently at issue, the New York Court of Appeals uses the terms "significant" and "consequential" interchangeably and defines "significant" and "consequential" simply as "important." *Toure v. Avis Rent A Car Sys.*, 98 N.Y.2d 345, 353, 746 N.Y.S.2d 865, 774 N.E.2d 1197 (2002) (quoting *Dufel v. Green*, 84 N.Y.2d 795, 798, 622 N.Y.S.2d 900, 647 N.E.2d 105 (1995)). The inquiry of whether the limitation of use is important "relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Id.* Further, "significant" denotes something more than minor limitation of use; minor, mild or slight limitation is classified as insignificant within the meaning of the statute. *Licari v. Elliott*, 57 N.Y.2d 230, 455 N.Y.S.2d 570, 441 N.E.2d 1088 (1982). Additionally, in determining whether an injury constitutes "significant limitation of use of body function or system," duration of limitation must be considered, as well as extent or degree of limitation. *Partlow v. Meehan*, 155 A.D.2d 647, 548 N.Y.S.2d 239 (2d Dep't 1989).

Dr. Block determined the "qualitative nature" of Byrne's inability to laterally bend or tilt at the waist "based on the normal function, purpose and use of the body part," *Dufel*, 84 N.Y.2d at 798, 622 N.Y.S.2d 900, 647 N.E.2d 105, by stating that Byrne's range of motion is less than Dr. Block would expect in a "normal" man of Byrne's age and general health. (Affidavit of Jerome D. Block, M.D., sworn to September 9, 2004 ("Block Aff.") ¶ 4). Dr. Block provides a "comparative determination of the degree of" Byrne's injury by testifying that Byrne's ability to tilt to the left was diminished by 25–30%. *Id.* Dr. Block attributes Byrne's limitation of motion to the nature of his injuries by opining that Byrne's "inability to normally move his lower torso and left lower extremity" are "reflected in his difficulty climbing stairs and with bending." *Id.* ¶ 8. Dr. Block's opinion is supported by the objective medical evidence of Byrne's August 13, 2002 MRI, and Dr. Block's physical examination. Dr. Block further remarked that due to Byrne's unchanged condition as of Dr. Block's May 18, 2004 examination, Byrne's injuries are permanent and connected with the instant accident. *Id.* ¶ 9.[4]

 The Court finds that the plaintiff has raised triable issues of fact with regard to whether he suffered serious injuries that fall within the categories of permanent consequential limitation of use of a body organ or member and significant limitation of use of a body function or system under the New York Insurance Law § 5102(d). Byrne's alleged limitations of use were not so mild, minor or slight, such that the Court may consider them insignificant within the meaning of New York Insurance Law § 5102(d). *Toure*, 98 N.Y.2d at 353, 746 N.Y.S.2d 865, 774 N.E.2d 1197 (citing *Licari*, 57 N.Y.2d at 236, 455 N.Y.S.2d 570, 441 N.E.2d 1088;

(Consol.2005). Therefore, the court does not address defendant's argument on summary judgment relating to this category.

4. With regard to Byrne's prior medical history, including the fifteen year-old golfing injury and the 1990 car accident, Dr. Block testifies that Byrne "had been asymptomatic for many years prior to the accident in question." (Block Aff. ¶ 3).

*Gaddy,* 79 N.Y.2d at 957, 582 N.Y.S.2d 990, 591 N.E.2d 1176; *Scheer v. Koubek,* 70 N.Y.2d 678, 679, 518 N.Y.S.2d 788, 512 N.E.2d 309 (1987)). Dr. Block's testimony explained the plaintiff's limitation of use of Byrne's lower torso and lower extremity in qualitative and comparative terms, and indicated that Byrne's symptoms had not meaningfully diminished two years after the accident. Considering plaintiff's evidence in the light most favorable to him, the defendants' motion for summary judgment must be denied.

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED. A pretrial schedule will be established in the accompanying Order.

**SO ORDERED.**