**Ritchie R. BROWN, Plaintiff,**

v.

**TRIBORO COACH CORPORATION, Defendant.**

**No. Civ.A.CV–99–2766(DGT).**

United States District Court, E.D. New York.

June 1, 2001.

---

Ritchie R. Brown, Astoria, NY, Plaintiff, Pro se.

Joseph R. Harbeson, Ruskin, Moscou, Evans & Faltischek, P.C., Mineola, NY, for Defendant.

*MEMORANDUM AND ORDER*

TRAGER, District Judge.

Pro se plaintiff Ritchie R. Brown has brought suit against defendant Triboro Coach Corporation ["Triboro"] pursuant to Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990 [the "ADA"]. First, Brown claims that his termination from Triboro was motivated by discrimination based on his race and his extensive absences caused by two disabling physical conditions. Second, Brown claims that Triboro failed to accommodate his disability by not providing him with a light-duty position while he was unable to perform his regular duties as a bus operator. Third, Brown claims that Triboro terminated him in retaliation for his extensive absences and refusal to sign a resignation letter. Defendant now moves for summary judgment on the following grounds that: (1) Brown's claims of racial discrimination are without sufficient factual support; (2) Triboro had a legitimate reason for terminating Brown based on his two positive drug tests and failure to complete the required rehabilitation program; (3) Brown did not qualify for relief under the ADA or for a light-duty position under Triboro's light-duty policy; and (4) Brown's retaliation claim is procedurally barred because Brown did not assert this claim at the initial state proceedings, and it is illogical under the circumstances. Defendant also requests that attorney's fees be awarded in accordance with 42 U.S.C. § 2000e–5(k) and/or 42 U.S.C. § 1988.

### Background

Triboro is an omnibus carrier, providing passenger service within, and pursuant to operating authority from, the City of New York. Aff. of Chris Tortora ¶ 5 [hereinafter "Tortora Aff."], sworn on September 14, 2000. Ritchie R. Brown, who is African–American, was hired as a bus operator by Triboro in June, 1987 and continued in that position until his termination on December 17, 1998. *See id.* ¶ 6. Chris Tortora, Triboro's Director of Transportation, supervised Brown during his employment. As an operator, Brown was a member of the Transport Workers Union of America, AFL–CIO, Local 100 ("TWU Local 100"), the collective bargaining agent for all of Triboro's drivers and shop mechanics. *See id.*

As a public carrier, Triboro is subject to federal mandates with regard to drug and alcohol testing of its bus operators. *See id.* ¶ 7. In furtherance of those mandates, in November, 1995 Triboro and TWU Local 100 entered into an agreement which provides for the drug testing of Triboro's operators, the disciplinary action to be taken when an operator fails a drug test, and the rights, if any, of an operator who has tested positive to enter a rehabilitation program and avoid termination. *See id.* Under Triboro's drug testing agreement, operators are subject to testing under a number of circumstances, including tests as part of an operator's regularly scheduled certifications under New York Transportation Law Article 19A, as well as on reasonable suspicion, on a random basis,

and as a follow-up to a prior positive test. *See* Def.'s Ex. C, at 2–3.

Regarding disciplinary action under Triboro's agreement, "[e]very employee who tests positive . . . shall be immediately relieved of duty and, if eligible, shall be referred to the EAP [Employee Assistance Program, a rehabilitation program]." *Id.* at 3. "An employee shall be permitted to utilize [the EAP] only twice in a lifetime." *Id.* at 1. Failure to agree to enter the EAP within seven days of being relieved of duty or having had two prior positive tests will result in discharge. *See id.* at 3. Thus, under the agreement, an employee who tests positive for a prohibited substance three times is discharged. In addition, the agreement states that an employee "shall be allowed to return to duty upon . . . certification . . . that the employee passed a drug/alcohol test and successful completion of the rehabilitation." *Id.* at 4. While the agreement does not directly state that an employee who fails to complete a required course of rehabilitation will be discharged, it indicates that Triboro may fail to reinstate such an employee.

From April through late October, 1998, Brown was on disability leave for severe obstructive sleep apnea,[1] cellulitis of his right foot and a fractured toe. *See* Dep. of Ritchie R. Brown at 12 [hereinafter "Brown Dep."] sworn on June 22, 2000. In May, 1998, while on leave, Brown underwent a drug test as part of an annual Article 19A certification, and he tested positive for cocaine metabolite. *See* Def.'s Ex. E, Report of LabOne. Brown concedes that at the time of this test he understood the terms of Triboro's drug testing agreement. *See* Brown Dep. at 15. As a result, a grievance meeting was held on June 10, 1998, and Triboro and TWU Local 100 agreed that Brown would enter the EAP. *See* Def.'s Ex. E, Report of June 10, 1998 Grievance Meeting for R. Brown. While still on leave, Brown attended the EAP, and although he ceased participating temporarily in July, 1998 in order to undergo a surgical procedure for his sleep apnea, *see* Brown Dep. at 24, he later resumed and completed the required rehabilitation. *See* Tortora Aff. ¶ 11.

On October 27, 1998, shortly after his return to work, Brown took a follow-up drug test, which reported another positive result for cocaine metabolite. *See* Def.'s Ex. G, Report of Lancer Compliance Services. On November 9, 1998, a grievance hearing was held, during which Triboro indicated its intention to terminate Brown. *See id.*, November 9, 1998 Report of Grievance Meeting for R. Brown. However, with the involvement of TWU Local 100, Brown exercised his right under Triboro's agreement to enter rehabilitation again. *See id.* Although Brown failed to enter the EAP within seven days as required under the agreement, Triboro ultimately

---

1. Sleep apnea is a disorder which causes a person to cease breathing for longer than ten seconds while asleep; it can be caused by a brain wave abnormality or irregularities in a person's airway musculature. Obstructive sleep apnea, the most severe form, is a condition in which sagging muscles of the soft palate and uvula, or enlarged tonsils and adenoids, cause airway obstruction, making breathing labored and producing loud snoring. In some cases, the condition causes a person's airway to become completely blocked, which forces the person to rouse from sleep and resume breathing. Obstructive sleep apnea can seriously disrupt a person's work and social life, causing "excessive daytime sleepiness," "sleep at inappropriate times," "motor vehicle accidents," and "difficulty with concentration and memory." Charles B. Clayman, M.D. ed., *The American Medical Association Encyclopedia* 916 (Random House 1989).

Brown's physicians specifically indicated to Triboro that Brown may not safely operate a bus until his sleep apnea was treated, and neither Brown nor Triboro contested this.

did not prevent him from doing so. *See* Tortora Aff. ¶ 17; Brown Dep. at 53–54.

During December, 1998, Brown stopped attending the rehabilitation program due to an alleged illness. *See* Brown Dep. at 55. When Brown did not return to the rehabilitation center as instructed, he was expelled from the program for non-compliance. *See id.* at 56. On December 17, 1998, Triboro was notified by the center that Brown had not completed the program and was no longer under its care. *See* Def.'s Ex. H, December 17, 1998 Letter from Care Plus Solutions. That day, Triboro conducted a hearing at which Brown was terminated for failing to complete the required treatment program. *See* Def.'s Ex. I, December 17, 1998 Report of Grievance Meeting for Ritchie R. Brown.

Brown filed administrative complaints dated February 11, 1999 with the New York State Division of Human Rights and the Equal Employment Opportunity Commission charging Triboro with engaging in unlawful discriminatory practice relating to employment on the basis of his race and disability. *See* Def.'s Ex. N. Brown received an administrative notice of right to sue dated May 10, 1999 from the Equal Employment Opportunity Commission and filed his complaint in federal court on May 11, 1999. *See* Def.'s Ex. A.

### Discussion

### 1. Brown's Title VII Claim of Racial Discrimination and Disparate Treatment

██ Under Title VII, it is illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). In cases brought under Title VII, the plaintiff has the initial burden of establishing a prima facie case of discrimination. A

plaintiff satisfies this burden when he shows that: (1) he is a member of a protected class; (2) who is qualified for his position; (3) who suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances that give rise to an inference of discrimination on the basis of his membership in that class. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817,1824, 36 L.Ed.2d 668 (1973); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 311–12 (2d Cir.1997). The plaintiff bears the burden of persuasion on the elements of the prima facie case. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. However, the requirements for establishing a prima facie case are "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997).

Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. "The defendant need not persuade the court that it was actually motivated by the proferred reasons." *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The defendant must, however, "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Id.* at 255, 101 S.Ct. at 1095.

Where the defendant discharges this burden of production, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *Hicks*, 509 U.S. at 510, 113 S.Ct. at 2748 (1993). The factfinder must then proceed to the ultimate question of whether the

defendant intentionally discriminated against the plaintiff. Summary judgment is appropriate in cases where the state of the evidence is such that a reasonable trier of fact could not find in favor of the plaintiff. *See, e.g., McLee v. Chrysler Corp.,* 38 F.3d 67 (2d Cir.1994); *Dister v. Continental Group, Inc.,* 859 F.2d 1108 (2d Cir. 1988); *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985).

Brown satisfies two out of four elements of a prima facie case of racial discrimination. As an African–American, Brown is a member of a protected class, and he suffered an adverse employment action in being terminated. A plaintiff suffers an adverse employment action when he "endures a 'materially adverse change in the terms and conditions of his employment.'" *Richardson v. New York State Dep't. of Correctional Serv.,* 180 F.3d 426, 446 (2d Cir.1999) (quoting *McKenney v. New York City Off–Track Betting Corp.,* 903 F.Supp. 619, 623 (S.D.N.Y.1995)).

However, Brown does not satisfy the second and fourth parts of the *McDonnell Douglas* test. Regarding his general qualification for employment, Brown was not qualified to remain employed at Triboro because he had failed to complete rehabilitation after his second positive test for cocaine metabolite and was thus in violation of Triboro's drug testing agreement, as negotiated with TWU Local 100. Also, Brown is not able to meet the fourth requirement of a prima facie case because he is unable to show that he was terminated under circumstances giving rise to an inference of discrimination based on his race. Under Triboro's drug testing agreement, it was within Triboro's authority to terminate Brown for failing to complete the required rehabilitation after his second positive drug test. Thus, Triboro terminated Brown based on a valid, non-discriminatory reason.

■ An employee may show an inference of racial discrimination by adducing evidence that similarly situated employees were treated more favorably. *See Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 63 (2d Cir.1997). To be similarly situated, the individuals to whom a plaintiff compares himself have to be similarly situated "in all material respects." *Id.* at 64. The Second Circuit has clarified that this standard varies somewhat from case to case but always requires "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham v. Long Island R.R.,* 230 F.3d 34, 40, 41 (2d Cir. 2000). In other words, "there should be an 'objectively identifiable basis for comparability.'" *Id.* (citations omitted). To further explicate this standard, the *Graham* court stated that a determination of what constitutes "all material respects" must involve consideration of (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness. *See id.*

The *Graham* court noted that the Second Circuit, in *Shumway, see supra,* has not expressly adopted the Sixth Circuit's requirements set forth in *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992), that the plaintiff and others claimed to be similarly situated "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Graham,* 230 F.3d 34, 39, 40, n. 1. Ordinarily, whether or not two employees are similar-

ly situated presents a question of fact for the jury. *See id.* at 39, (citation omitted).

In addition, it is well-established that a plaintiff is not required to produce direct evidence of discrimination, *see Luciano v. Olsten Corp.*, 110 F.3d 210, 215 (2d Cir. 1997), and that the plaintiff's case may be built entirely out of circumstantial evidence, *see, e.g., Burger v. New York Institute of Technology*, 94 F.3d 830, 833–35 (2d Cir.1996). "Direct, smoking gun, evidence of discrimination" is rarely available in cases such as this one. *Richards v. New York City Bd. of Educ.*, 668 F.Supp. 259, 265 (S.D.N.Y.1987), *aff'd*, 842 F.2d 1288 (2d Cir.1988).

Brown attempts to show that the circumstances of his termination give rise to an inference of racial discrimination by claiming that four white bus operators were treated more favorably because they either remained employed after failing drug tests or were allowed to fail more tests before being terminated. *See* Def.'s Ex. L, Pl.'s Resp. to Def.'s First Set of Interrogs., ¶¶ 3–5. To show that he is similarly situated to these employees, the objectively identifiable basis for comparability which Brown asserts is their history of violations of Triboro's drug testing agreement and Triboro's disciplinary response to such violations. Accepting this basis for comparability, it should be noted that Brown and the other employees were indeed subject to the same drug testing agreement and, thus, to the same workplace standards as stated therein. However, Brown was not similarly situated to these employees because his violations of the *drug testing agreement* were more egregious, and Triboro, therefore, was justified in terminating him.

## 1. *John O'Neill*

Brown alleges that John O'Neill failed three drug tests, *see* Pl.'s Mot. Summ. J. at

3, "Evidence # 1," but the record indicates that he failed two tests and completed the required rehabilitation on both occasions. *See* Tortora Aff. ¶ 27(c). Moreover, unlike O'Neill, Brown did not complete rehabilitation after his second positive drug test and was thus in violation of Triboro's agreement. O'Neill took a drug test in connection with his Article 19A certification on May 4, 1998 and tested positive for marijuana. *See* Def.'s Ex. P, June 8, 1998 Report of Grievance Meeting for J. O'Neill. Triboro and TWU Local 100 determined that O'Neill would enter a rehabilitation program. *See id.* On August 31, 1999, O'Neill took a reasonable suspicion drug test, which showed a positive result for cocaine. *See* Pl.'s Mot. Summ. J. at 7, September 17, 1999 Report of Grievance Meeting for J. O'Neill. Triboro and TWU Local 100 again determined that O'Neill would enter a rehabilitation program. *See id.* Several months later, Triboro discharged O'Neill for failing to submit to a required random drug test. *See* Pl.'s Mot. Summ. J. at 12, December 29, 1999 Letter from Triboro to J. O'Neill. However, this decision was sent to arbitration and overturned on February 4, 2000 because of insufficient evidence that O'Neill knowingly avoided the test. *See* Tortora Aff. ¶ 27(c); Def.'s Ex. R. Thus, while it appears that Triboro treated O'Neill less harshly than Brown by reinstating him, the relief granted to O'Neill after he was discharged resulted from the decision of an arbitrator and was not discriminatory treatment by Triboro officials.

Prior to O'Neill's positive drug tests, on February 9, 1998, he was convicted of driving while intoxicated, and his license was suspended. *See* Def.'s Ex. Q, March 13, 1998 Letter from New York State Dept. of Motor Vehicles. In accordance with Triboro policy, O'Neill was given sixty (60) days to obtain reinstatement of his license,

and during this period was given a non-driving assignment. *See* Tortora Aff. ¶ 27(c). O'Neill's license was later reinstated, and he returned to active duty. *See id.* Triboro acknowledges that Brown may have considered this conviction as a third failed drug test. *See* Reply Aff. of Chris Tortora ¶ 11 [hereinafter "Tortora Reply Aff."], sworn on November 29, 2000. However, Triboro asserts that the conviction occurred while O'Neill was off duty and not while he was driving for the company, and as such, it did not fall within the company's drug testing agreement. *See id.* This assertion is supported by the portion of Triboro's agreement stating that the "use of a prohibited substance . . . or testing positive on a prohibited substance test . . . while on duty, in a Company vehicle or on Company property is prohibited and grounds for immediate discipline . . ." *See* Def.'s Ex. C at 3.

### 2. *James Fazzalare*

The second operator, James Fazzalare, failed one drug test and then entered and completed the required rehabilitation program. *See* Tortora Aff. ¶ 27(d). Fazzalare was also involved in two incidents involving confrontations with other employees. First, on August 8, 1990, he had an argument with another employee after which he refused to travel his route. *See* Pl.'s Mot. Summ. J. at 16, August 9, 1990 Report of Grievance Meeting for J. Fazzalare. In addition to this incident, his poor attendance record (consisting of fifteen unauthorized absences during the past year) was noted by management. *See id.* While Triboro called for a two-week suspension, Fazzalare asked for leniency and was suspended for three days. *See id.* Second, on August 25, 1993, Fazzalare had a violent altercation with another driver. *See id.* at 17, August 26, 1993 Report of Grievance Meeting for J. Fazzalare. Triboro reminded both drivers that fighting results in discharge and took them both out of service pending a hearing. *See id.* However, Triboro failed to pursue the matter any further when Fazzalare and the other employee refused to testify against each other. *See* Tortora Reply Aff. ¶ 13.

The record does not indicate that Triboro considers an employee's history of violence or fighting in determining whether he has violated its drug testing agreement, although on the face of it, the agreement would not seem to permit it. In any case, Brown does not dispute that Fazzalare failed only one drug test and then entered and completed the rehabilitation program in accordance with Triboro's agreement. *See id.* ¶ 14. Brown claims that Fazzalare's confrontations are grounds for automatic termination of employment. *See* Pl.'s Mot. Summ. J. at 3, "Evidence # 2". However, while fighting often results in termination, very few violations of company rules lead to "automatic termination" where Triboro has no discretion to consider an employee's overall record and determine whether termination is warranted. *See* Tortora Reply Aff. ¶ 13. Triboro maintains that Fazzalare's confrontations did not warrant termination in light of his general work history. *See id.*

### 3. *Frank Spinelli*

The third operator, Frank Spinelli, had a prior positive result for marijuana on October 24, 1996. *See* Pl.'s Mot. Summ. J. at 19, June 11, 1998 Report of Grievance Meeting for F. Spinelli. He again tested positive for marijuana on a follow-up drug test conducted on May 6, 1998. *See id.* Unlike Brown, in both instances, Spinelli completed the required rehabilitation program. *See* Tortora Aff. ¶ 27(a). Thus, he was not in violation of the drug testing agreement. In addition, while Spinelli has had some periods of poor attendance resulting in several hearings since 1987, he

has also received safety awards and commendations from the public. *See* Tortora Reply Aff. ¶ 15.

#### 4. *Robert Marolda*

Finally, the fourth operator, Robert Marolda, was terminated on August 18, 1998, after testing positive on a third drug test, in accordance with Triboro's drug testing agreement. *See* Tortora Aff. ¶ 27(b). After his two prior positive results, he had entered and completed the rehabilitation program as required under Triboro's agreement. *See id.* Other than his testing history, Marolda had a 15-year tenure at Triboro with no accidents or other serious disciplinary issues. *See id.*

Thus, Brown was not similarly situated to O'Neill, Fazzalare or Spinelli because, unlike these drivers, he failed to complete his required course of rehabilitation after his second positive drug test. Furthermore, Brown was not similarly situated to Marolda because Marolda had completed the required rehabilitation after each of his first two positive tests, which, again, Brown did not do.

In sum, the employment records of the only specific white employees Brown identified do not show that Triboro inconsistently implemented the terms of its drug testing agreement with regard to Brown's violations. Also, Brown has no independent knowledge that the identified white employees were either subject to fewer drug tests or not required to complete their rehabilitation programs. *See id.* at 28. Moreover, Triboro, in response to this court's April 23, 2001 order requesting additional information concerning Triboro's termination and employment practices, has indicated that between and during the calendar years 1995 and 1999, only three employees, aside from Brown, were terminated for violations of the drug testing agreement. *See* Suppl. Aff. ¶ 2. Of

these, one was black, and two were white. *See id.* The black employee, Phillip Weston, was terminated after refusing to enter rehabilitation after a positive drug test. *See id.* The two white employees, Frank Dinello and the aforementioned Robert Marolda, were terminated after each failed a third drug test. *See id.* Over the course of these same years, no Triboro employees who had failed a third drug test or who had failed to complete rehabilitation were retained by Triboro. *See id.* ¶ 3. Thus, Triboro legitimately terminated Brown under its drug testing agreement, and the pertinent facts of the identified white employees' records create no genuine issue of material fact with regard to his allegations of disparate treatment based on race.

In addition, other facts and circumstances indicate that Brown's racial discrimination claim is unsubstantiated. He claims to have been a first-hand witness to black employees being treated differently from white employees, and that an older black employee who has worked at Triboro for twenty years once told him that he could not do what white employees did. *See* Pl.'s Mot. Summ. J. at 1. However, Brown admittedly based his claims on scuttlebutt around the workplace, *see* Brown Dep. at 115–16, and parties seeking to oppose summary judgment must "set forth such facts as would be admissible in evidence ..." Fed.R.Civ.P. 56(e). *See also Kulak v. City of New York,* 88 F.3d 63, 70 (2d Cir.1996) ("Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.").

Brown also disputes the results of his first positive drug test by alleging that his name and badge number did not originally appear on the results and were later filled in with pencil. *See* Def.'s Ex. L, Pl.'s Resp. to Def.'s First Set of Interrogs.,

¶ 11. However, while Brown's name and badge number are indeed handwritten on the test results, his Social Security number is clearly typewritten. *See* Def.'s Ex. E, Report from LabOne. Brown also disputes the second positive drug test because he was taking prescribed medication at the time of the test. *See* Def.'s Ex. L, Pl.'s Resp. to Def.'s First Set of Interrogs., ¶ 11. However, at deposition, he did not recall whether he had discussed his prescription with the lab technician. *See* Brown Dep. at 50–51.[2]

Regarding Brown's failure to complete the required rehabilitation, at his final hearing in December, 1998, he did not refute the communication by Care Plus Solutions that he was non-compliant. *See id.* at 66. He also did not recall whether he informed anyone at Triboro during his hearing that he stopped attending rehabilitation due to illness. *See id.* In addition, he did not recall whether a union representative made any defense for him or whether he discussed his illness with a union representative prior to the hearing. *See id.* at 67. Also, Brown did not submit at the time of the hearing, and has not since submitted, any doctor's note to support his claim of illness. *See id.* at 68.

Overall, Brown has not presented sufficient evidence, either direct or circumstantial, to establish a prima facie case of discrimination and suggest that Triboro terminated him under circumstances giving rise to an inference of racial discrimination, insofar as Brown was unable to identify similarly situated individuals who were treated differently. Moreover, even assuming he has presented a prima facie case, Brown has not come forward with admissible evidence sufficient to cast doubt upon Triboro's stated non-discriminatory reason for his termination, namely, his second positive drug test and failure to complete rehabilitation, or to show that this reason was merely a pretext for a discriminatory motive. Nor has Brown requested additional discovery or given any indication that such discovery would produce anything of relevance to his claim. Thus, Triboro's summary judgment motion with respect to Brown's Title VII claim should be granted.

### 2. Brown's Claims Under the Americans With Disabilities Act

#### (1)

Brown's first claim under the ADA is that Triboro terminated him on the basis of his disability, or due to his extensive absence caused by cellulitis of his right foot and course of treatment for sleep apnea.[3] *See* Pl.'s Complaint, ¶¶ 4, 8; Def.'s Ex. L, ¶ 6. Courts reviewing discrimination claims under the ADA have applied the burden-shifting *McDonnell Douglas* framework employed in the analy-

---

**2.** At deposition, Brown stated that during 1998 he had taken a drug test on his own before his first test for Triboro later that year in May. *See id.* at 33–34. This test was negative, and Brown provided the results to Triboro, *see id.* at 34, but the record contains no documentation of this account.

**3.** In April of 1998, Brown went on disability leave due to cellulitis of his right foot and a fractured toe. *See* Brown Dep. at 35–36. During this period, he also began to undergo testing regarding his sleep apnea condition. *See id.* at 36. It is not clear from the record exactly when, or even if, Brown recovered from his cellulitis and fracture. However, his sleep apnea extended his disability leave until mid-October of 1998 because Brown was referred to a specialist and eventually had to undergo surgery and post-operative therapy before his doctors would authorize him to return to work. Because Brown alleges he was fired due to his extensive absence, and because it was his sleep apnea that caused his leave to be so extensive, both parties focus on that condition as the disability at issue.

sis of claims under Title VII. *See, e.g.,* *Brennan v. Bausch & Lomb, Inc.,* 950 F.Supp. 545, 549 (E.D.N.Y.1997); *Estwick v. U.S. Air Shuttle,* 950 F.Supp. 493, 500 (E.D.N.Y.1996); *Duprey v. Prudential Ins. Co. of America,* 910 F.Supp. 879, 883 (N.D.N.Y.1996); *Price v. S.B. Power Tool,* 75 F.3d 362, 364–65 (8th Cir.1996); *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995); *DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 797 (7th Cir.1995); *Ennis v. National Ass'n of Business and Educational Radio, Inc.,* 53 F.3d 55, 57–58 (4th Cir.1995); *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 156–57 (3rd Cir. 1995).

Thus, in order to establish a prima facie case of discrimination, Brown must first prove that he was a member of a protected class because he had a disability within the meaning of the ADA.[4] Under the ADA, a "disability" is a "physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). Major life activities include breathing, hearing, seeing, walking and working. *See* 29 C.F.R. § 1630.2(i). Brown does not specify which major life activity, if any, was substantially limited by his physical condition. However, it appears that breathing and working are the only two major life activities that would be affected by sleep apnea and, thus, which are of any relevance to this case.

The Second Circuit has held that an employee claiming a substantial limitation on the major life activity of breathing must adduce sufficient evidence of breathing problems outside of the work environment. For example, *Muller v. Costello,* 187 F.3d 298 (2d Cir.1999), involved a correctional officer suffering from severe bronchitis and asthma who was advised by his physician to have no exposure to tobacco smoke while at work. The court, relying on *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 723 (2d Cir.1994), which held that an employee's asthma did not substantially limit her breathing ability because it did not prevent her from exercising, held that the officer's condition did not substantially limit his breathing ability because he was able to engage in substantial physical activity, such as exercising and participating as a member of the military reserves, outside of work without encountering debilitating allergens. *See id.* at 314.

Brown has failed to show a substantial limitation on his ability to breathe because his sleep apnea affected his breathing only during sleep. While this condition prevented Brown from driving for Triboro, he has adduced no evidence of a breathing impairment that precluded him from engaging in other activities. Furthermore, Brown claims to have requested a light-duty position while on disability leave, which makes it seem less likely that his sleep apnea significantly hindered his breathing in general. Therefore, Brown has not shown a substantial limitation on the major life activity of breathing.

█ Turning from breathing to working, for an employee to show that his disability impairs his ability to work, he must demonstrate that his disability precludes him from holding "either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. at § 1630.2(j)(3)(i). "The inability to perform a single, particular job

4. For purposes of establishing an ADA discrimination claim, Brown may also have a disability within the meaning of the ADA if Triboro regarded him as having a physical or mental impairment substantially limiting one or more of his major life activities. *See* 42 U.S.C. § 12102(2)(C). There is no indication on this record, however, that Triboro regarded Brown as being disabled to an extent greater than he actually was.

does not constitute a substantial limitation in the major life activity of working." *Id.*

The Supreme Court in *Sutton v. United Airlines,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), noted certain factors adopted by the EEOC to determine the severity of an employee's work limitations such as

> the geographical area to which the individual has reasonable access, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified.

*Id.* at 492, 119 S.Ct. at 2150. The *Sutton* Court also noted that

> [t]o be substantially limited in the major life activity of working ... one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Id.* Accordingly, the Second Circuit has held that an employee who is unsuited to a particular position has not thereby demonstrated an impairment substantially limiting the major life activity of working. *See Heilweil, supra* at 723 (citing *Daley v. Koch,* 892 F.2d 212, 215 (2d Cir.1989)).

Regarding Brown's training, knowledge, skills and abilities, in terms of his educational background, Brown has completed up to the eleventh grade but has had no further educational or vocational training. *See* Brown Dep. at 10. Before working at Triboro, Brown had received a bus driver's class license, which did not necessitate specialized training, *see id.* at 11, and once Brown was employed at Triboro, he received only regular route training. *See id.* at 13. Still, Brown's sleep apnea precluded him from driving for Triboro, and, presumably, would have precluded him from doing so for any other carrier. Moreover, sleep apnea would seem to have precluded Brown from any job that presents any physical risk. Even sedentary jobs that required constant wakefulness, such as a security desk job, would be beyond his ability to handle. While Brown has not shown that his sleep apnea substantially limited his ability to breathe, his condition may have substantially limited his ability to work within the meaning of the ADA. Thus, he may have a qualifying disability under the ADA. However, the issue need not be definitively resolved because even if Brown's sleep apnea constituted a qualifying disability, to establish a prima facie case, Brown also has to produce evidence indicating that he was terminated under circumstances giving rise to an inference of discrimination based on his disability.

Brown claims that his supervisor Tortora threatened to replace him with another employee due to his extended period of disability leave. *See* Pl.'s Compl. at 6. The transcript of a particular telephone conversation between Brown and Tortora while Brown was on leave shows that Tortora indeed stated: "I think we're gonna have to look for another employee," because Brown's disability benefits and the fees for a replacement driver were financially burdensome. *See* Transcription of Tape of R. Brown at 4. In addition, the same conversation indicates that Tortora was certainly suspicious about whether Brown was diligently pursuing treatment or deliberately prolonging his disability leave. *See id.* at 2, 5, 6. For example, Tortora referred to the disagreement between Triboro's physician and Brown's physician and surgeon about whether a second sleep study after Brown's surgery was necessary, and he stated: "I suggest you find another doctor who ok's you to get back to work, because

you and I both know that you're ok." *Id.* at 6. He also mentioned that Brown had a hearing coming up because he was "loosing [sic] a lot of time" at work, *id.* at 4, which was contributing to management's "serious problem" with him. *Id.* at 5. Brown asked whether Triboro would attempt to fire him if he returned to attend the hearing, to which Tortora responded: "I don't know. We gotta [go] through the grievances here, Rich. [O]ur doctor thinks you are fit for duty now, he thinks you can come back to work and you're fine." [5] *Id.* at 4.

Furthermore, during a conversation between Brown and Billy Morea, a union representative, after Brown had already been terminated, Morea acknowledged having earlier made a statement to Brown that the drug charges were "b.s." and that the real reason for Brown's termination was his prior absences. *Id.* at 16. However, they did not discuss Morea's statement any further during this conversation, and neither Morea nor Brown has since supported it with any other relevant details that would make it more than conclusory.

Brown would appear to satisfy the requirement of having suffered an adverse employment action insofar as he was terminated from his position. However, even assuming that this evidence would some- how constitute a prima facie case that Brown was dismissed because of his sleep apnea, he has not established a prima facie case because he was no longer qualified for his position when he was terminated. While it is clearly evident from the transcripts that Tortora badgered, even harassed, Brown about the timetable for his treatment, Brown has adduced no evidence other than Tortora's and Morea's statements to suggest that Triboro's motive to fire him had anything to do with his disability.[6] Brown's claim of having been terminated due to Triboro's ire at the length of his disability leave is belied by the fact that he was not terminated during his absence. Moreover, at no time during his absence did Triboro threaten to cancel his disability benefits. *See* Brown Dep. at 37–38. Also, Brown acknowledges that his period of disability leave was not mentioned at his hearings on November 9 or December 17, 1998. *See id.* In fact, Brown resumed his full-time duties after his doctors had certified the effectiveness of his treatment, and he was terminated only after he failed a second drug test and Triboro received notice from Care Plus Solutions that he had stopped attending the rehabilitation program.

5. It is unclear from the record whether this hearing on Brown's attendance ever took place. Brown does not refer to it in the "facts" portion of his complaint.

6. The argument could be made that an employer's termination of an employee due to the employer's belief that the employee is no longer disabled and is malingering is not covered by the ADA at all, since the employer, in such a case, would not be discriminating against an employee on the basis of a perceived or actual disability, but rather, would be terminating an employee for feigning a disability when he no longer has one. While this argument may initially appear compelling, allowing an employer taking this position to prevail automatically on a motion for summary judgment would preclude an actually disabled plaintiff from adducing proof at trial that he was, in fact, disabled and that the employer manufactured the malingering accusation in order to be able to terminate a disabled employee whom an employer has grown tired of accommodating. Accordingly, at least some portion of such cases—those where the employee has presented some reason to think that he may have actually been disabled and that the employer had reason to know this, for example—should probably survive the summary judgment stage. In any event, whether or not Brown's case falls into this category need not be decided definitively at this time since Brown's ADA claim is incoherent for reasons detailed below.

Thus, even if Brown's sleep apnea was a qualifying disability within the meaning of the ADA, he failed to establish a prima facie case of discrimination based on his sleep apnea.

### (2)

■ Brown's second claim under the ADA is that Triboro failed to reasonably accommodate his disability by not providing him with a light-duty position while he was on disability leave.

Even if Brown had a qualifying disability and thus established a prima facie case of discrimination based upon disability, he must have been a "qualified individual with a disability" at the time he requested the reasonable accommodation. 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Under the ADA, an employer discriminates against a disabled but otherwise qualified employee by failing to make reasonable accommodations to the employee's known physical or mental limitations, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the employer's business. *See* 42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodation" may include job restructuring, part-time or modified work schedules, or reassignment to a vacant position. *See* 42 U.S.C. § 12111(9). In addition, regulations promulgated pursuant to the ADA state that employers are required to provide

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual

with a disability to perform the essential functions of that position; or

(iii) Modifications that enable a[n] ... employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(*o*)(ii) and (iii).

Brown was not a qualified individual with a disability under the ADA because while he was suffering from sleep apnea, he was unable to perform the essential functions of his job. "Essential functions" are the "fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Sleep apnea rendered Brown unable to operate a bus safely, and Brown's doctors specifically stated that he may not return to work until they determined that his treatment was effective. *See* Def.'s Ex. F. It was only after Brown's surgery and post-operative therapy that he was deemed able to resume his normal job duties. *See id.*

Moreover, even if Brown were a qualified individual with a disability, Triboro would not have been obligated to reasonably accommodate his sleep apnea by providing him with a light-duty position because Brown did not request any accommodation from Triboro other than, presumably, to go on disability leave. ADA regulations provide guidance on the kind of request for an accommodation, if any, that an employee must make to establish a reasonable accommodation claim:

If an employee with a known disability is having difficulty performing his or her job, an employer may inquire whether the employee is in need of a reasonable accommodation. In general however, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed. . . .

Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.

*Sidor v. Reno*, 1997 WL 582846, *6 (S.D.N.Y.1997) (quoting 29 C.F.R. § 1630.9 App.). Thus, "it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Id.* (citing *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.1996) (interpreting 29 C.F.R. § 1630.9 App.), *cert. denied*, 519 U.S. 1029, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996)). The regulations do not require, however, that the terminated employee request the specific accommodations that he or she complains the employer did not provide in order to trigger the employer's obligation to investigate the sort of reasonable accommodations that might be appropriate for the employee. *Id.*

Brown made a request for light-duty to Charles Petrone, a union representative, but he did not recall making the same request to Tortora, Brown's supervisor, even though he spoke with Tortora on numerous occasions while he was on disability leave.[7] *See* Brown Dep. at 105. Furthermore, Brown received disability payments continuously from April, 1998 until just before he returned to work in October, 1998. *See id.* at 38. When Brown asked Petrone about a light-duty post, Petrone informed him that he was not eligible for such a position. *See id.* at 106. Under Triboro's light-duty policy, the few available non-driving positions are reserved for drivers who are not collecting any paycheck, such as those who had exhausted disability benefits or lost their licenses. *See* Tortora Aff., ¶ 33. Brown's paid disability leave was Triboro's method of accommodating Brown so that he could finish treating his sleep apnea. Thus, far from being a case where an employer discriminates against a disabled individual by firing him instead of providing a reasonable accommodation, this is, rather, a case where the employer provided paid disability leave for the employee until the disability had been treated and returned the employee to his former position as soon as he was willing and able to resume it.

In any case, courts have held that, pursuant to the ADA and 29 C.F.R. § 1630.9, employers are required to make their light-duty programs available to disabled employees who are recuperating from temporary restrictions and are otherwise qualified to participate. *See, e.g., Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 680 (7th Cir.1998).[8] Therefore, if Brown had directly requested light duty from Triboro, his sleep apnea theoretically would not have prevented him from participating in the light-duty assignments which do not entail driving, assuming, of course, that Triboro's expansion of its limited light-duty program to accommodate Brown would not pose an undue hardship to the company.[9]

---

7. Brown does not dispute that Petrone never informed Triboro of Brown's request for light-duty.

8. However, the ADA has not been interpreted to require employers to convert light-duty positions into permanent positions for disabled employees. *See id.*

9. It is not clear in *Dalton* whether "otherwise qualified to participate" means that for an employee to be eligible for light duty, he must be otherwise qualified within the meaning of the ADA, or merely able to undertake the light-duty assignments sought. In any event; while Brown is not an otherwise qualified

However, because Brown was not a qualified individual with a disability and because he failed to request any reasonable accommodation from Triboro other than his disability benefits, Brown's reasonable accommodation claim under the ADA fails.

### 3. Brown's Retaliation Claims

■ Brown alleges that he was terminated in retaliation for his lengthy disability leave and refusal to sign a letter of resignation. *See* Def.'s Ex. L, ¶ 6. In order to establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) he was engaged in activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff based upon his activity; and (4) a causal connection exists between the plaintiff's protected activity and the adverse action taken by the employer. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993); *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990).

Brown does not satisfy the first requirement of a prima facie case of retaliation because being on disability leave is not a protected activity under Title VII. *See* 42 U.S.C. § 2000e–2(a) ("It shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate ... because of such individual's race, color, religion, sex, or national origin; or ... to limit, segregate, or classify his employees ... in any way which would deprive ...

any individual of employment opportunities or otherwise adversely affect his status ... because of such individual's race, color, religion, sex, or national origin."). *See also* 42 U.S.C. § 2000e–3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing ...."). This conclusion does not affect the analysis of Brown's discrimination claim under the ADA because the substance of that claim, being fired in retaliation for being on disability leave, is not a permissible basis for a retaliation claim under Title VII.

Furthermore, regarding the resignation letter, Brown was given the option of signing it in January, 1999, after he had already been terminated in December, 1998, so as to improve the appearance of his record at Triboro and, thus, his chances of securing future employment.[10] *See* Brown Dep. at 91–92, 131–32. It is, therefore, clear that Triboro could not in fact have terminated Brown for refusing to sign the resignation letter.

For the above reasons, Triboro's motion with respect to Brown's retaliation claims should also be granted.

### 4. Attorneys' Fees

■ Triboro requests that attorneys' fees be awarded pursuant to 42 U.S.C. § 2000e–5(k) and/or 42 U.S.C. § 1988. Courts may also award attorneys' fees to the prevailing party in an action brought under the ADA. *See* 42 U.S.C. § 12205.

---

individual with a disability under the ADA, there is no evidence that he would not have been able to assume non-driving responsibilities under Triboro's light-duty program.

10. Brown appeared to be under the impression that if he signed the resignation letter, a conflict would have arisen with respect to

collecting unemployment benefits. *See* Pl.'s Complaint at 7; Pl.'s Mot. Summ. J. at 30. While the situation is not entirely clear from Brown's statements, he apparently collected unemployment eventually. *See* Pl.'s Mot. Summ. J. at 30.

The Supreme Court has held that a plaintiff in a Title VII action should not be assessed his opponent's attorneys' fees unless a court finds that his claim was frivolous, unreasonable, or groundless. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). The Second Circuit has also held that successful defendants should be awarded attorneys' fees not routinely, but only where the action brought is found to be unreasonable, frivolous, meritless or vexatious. *See Carrion v. Yeshiva Univ.*, 535 F.2d 722, 727 (1976).

Applying this reasoning to Brown's claims under the ADA, this court will not award Triboro attorneys' fees because Brown's ADA claims cannot be said to have been entirely without merit in light of Tortora's statements to Brown that Triboro would have to replace him if he did not find a physician who would approve him to return to work before the completion of his treatment for sleep apnea.

### Conclusion

Brown's claim of racial discrimination and disparate treatment under Title VII is dismissed. His claims of disability discrimination and failure to provide reasonable accommodation under the ADA are also dismissed. The Clerk of the Court is directed to close the case.

SO ORDERED.